I'm Benjamin Favone. I represent the estate of Gabino Flores and Benjamin Flores Jr. Like every case, hopefully most of the information you need to make a decision is in the briefs and in the record. There's just – You didn't send you a notice in terms of that you should be prepared to talk about the clerk's order cost? Yes, I did. And that is before us even? Yes. Because there wasn't a separate notice of appeal on that. I think you're right. Okay. Well, then spend your time on other things. Thank you. I think the most interesting thing about this case is a decision that came down in January of this year called Smith v. City of Hemet. That's from this Court, 394 F. 3rd, 689. And it's a canine case. And what Smith says, basically, is that this Court's going to fall in line with other circuits to add the possibility of serious bodily injury within the definition of deadly force. And then it goes on to say, let's give the district judge another chance to consider whether use of a canine is, in fact, deadly force. I think that case compels the Court, this Court, to give my district judge another look at my canine issue, because in my case, we were kicked out on summary judgment on the canine issue, and we had a theory that if we had won on the canine issue, we would have a very short and easy path to a finding of liability. And, you know, in general, the use of canines has just been something we've always been really critical of in terms of the police use of canines. I mean, just the results that we see and people really getting beat up. And it maybe took this Court a little bit more time than the rest of the nation, but this Court has come around to say, hey, these canines do so much damage to people under circumstances that are often not really warranted, especially in hindsight, that we have to kind of raise the bar on canines. In this situation, we have the combination. You've got the summary judgment, I think, on the qualified immunity issue. But we also had a trial. And the jury was basically, from what I can ascertain in going through the trial, the jury was basically, you know, presented with all the facts of what happened from when, I think, the border called the police, and then there were, you know. So the jury actually heard those incidents, and they come down after the whole thing and find in favor of essentially the officers in this situation after hearing that. And so they did get to hear all of that. And obviously, the deceased, I mean, it's an incredibly tragic situation. I don't think anyone would disagree with that. It's a person with mental illness issues. But nevertheless, the jury heard certain facts about, you know, he'd been threatening the border previously. They're called, and then there's stabs to the canine. And then I guess one of the officers actually gets stabbed before the person is shot. And I think that there's testimony in terms of, you know, it's not like mentally ill people can't be dangerous either. And sometimes there's some belief that they might even be more dangerous just because they don't understand. It doesn't make it less tragic. But I, as a former trial judge, it seems like the jury got to hear all of the facts. So you're coming back from that. I agree. I understand that. And I think it's certainly if our question is, well, you know, a jury didn't agree with your version of events, why should we disagree with it? But you have to remember what case, I mean — The jury was also told, too, if you think the officers sort of provoked this by the — there was some instruction about if the officers provoked this with the canine, that gave them some permission to go there. There was some semblance of a Billington theory. I mean, I liken what happened at trial as kind of like getting my skeleton to trial when I should have had my whole person there. I mean, by the time I got my Billington theory to trial, I didn't have a jury that was going to say, hey, what happened with the canine? Was that excessive or not? I — Well, what facts didn't they know about what happened with the canine? It's — they heard the facts. It's that, as the defense lawyer did a good job of pointing out, they just looked at it, hey, was overall, overall, is this thing reasonable? And I got hammered on the overall transaction and the totality of the circumstances under Graham, and that's an understandable argument to make when you don't — when you're not pressed as a juror to make independent decisions along the way. So what was the error? I mean, if the jury heard the case and decided it adverse to you, I mean, what's the legal error? The error is that we should have had the right to, first of all, have the canine issue considered itself. I mean, at the moment he releases a canine on a — basically a guy who's suffering a mental episode, is that excessive? Because if the jury answers yes to that, it's over. And if — and the jury could have easily — in fact, I would submit that the jury did say, well, we're not so impressed with the canine attack, but, you know, by the time the guy's over there stabbing the officer, or at least trying to, you know, we have reservations about that view because we didn't get a fair trial on the — on the stabbing stuff, and we'll talk about that. But it's not — overall, I would say self-defense applied. But we were entitled to just have more than just overall, you know, by the time he reaches — you know, by the time he's trying to stab the officer, did something go wrong? We're entitled to a finding, a jury finding or a judge finding that the canine attack was awful. I wonder if you would talk about the Jennifer Shen testimony. I was the trial lawyer in this case, and I've never been treated so badly. We had — we had a right to prepare for that, to — to give our best case against Jennifer Shen. I mean, I look back and I say, well, what really would I have different — done differently? And I don't think I would have deposed her because I wasn't taking depositions of the enlisted six experts. I don't think this was the greatest way to handle Jennifer Shen, to be honest with you, the way the district judge did it. I understand your point. What hangs me up a little bit, though, is that apparently she was disclosed as a potential witness. She had prepared this trace evidence report that had been turned over to you. So even though I don't think this was the proudest day, I kind of wonder what harm happened. Ham-handed, but when all is said and done, what was the harm? I appreciate that. As a trial lawyer, here's what I would have done. I would have accounted for her. Had she made it to the expert witness list, I would have done something. And in this case, as I look back at my actions and my decisions, my cost benefit decisions and that sort of thing, what I did with people like Jennifer Shen is I either got an expert or I rolled them into the experts that I had. In other words, if my experts that I had listed could cover the areas that she would cover, then I would send it over to my expert. If I didn't. But her report that you had said that she was going to match the scissors to the vest. Well, yeah. Well, the thing is, there's a hundred of those reports, okay? And you can't, I mean, mostly those reports just say I collected this and I put that in and, you know, I put this in that basket or that box or whatever. Without really having her listed as an expert, you kind of gloss over that. It's just really not fair to say, well, we snuck her in somewhere in the materials and we didn't tell you she was an expert. I mean, I just would, I would hate to think that the practice of law is now going to be advanced by, and this is not the trial judge's fault, but the other lawyer if I were learning from this case, I would start lying. I would start lying to the other lawyer, not putting things in expert reports, slipping them somewhere in the materials, and then trying to argue my way out of it at trial. And I just don't, I really sincerely think that it's a terrible precedent for the law to go that way, especially now when, you know, there's so much gamesmanship in the law. I just really urge the Court to think about what's fair and what kind of projection it wants to maintain for the practice of law, because if this kind of conduct is approved or at least overlooked, then it becomes the standard by which unscrupulous lawyers prosper, and the law is too good for that. I just have one other point I'd like to make, and it just goes back quickly to the canine issue. The officer's theory of using the canine was that, like any other tool, I use my tools. The suspect has to go down, and I am going to first tell him to go down, I am going to hit him, then I'm going to attack him with a dog, and if he doesn't do that, I'm going to shoot him. And that theory should be rejected, because just because a guy won't go down, in our case, he doesn't do anything. He literally does nothing. Well, is that really accurate, though? I mean, you stabbed the dog and you stabbed the officer. You can't say he did nothing. No, no. Well, again, my whole case here, my whole case under Billington is the moment that he releases the dog. Okay? And I would cite through the court Diorle, which really said, hey, officers, when it comes to mentally, you know, persons with mental disability, you have to step back, and you can't just assume that they're rational actors and that they will, you know, if they didn't respond to the last level of force, that you can then escalate. The officer has got to look at his subject under Diorle and say, hey, if this guy's not doing anything, and at the time that he releases the dog, he's not doing anything, he simply just held the baton after being, held the scissors after being hit with them, you can't just escalate. That's not escalation. The officer's view was that was escalation. And the trial court said, well, he didn't know whether that's escalation or not. He didn't know that you can't just send in a dog if the guy doesn't react. But under Graham and other, you know, Tennessee v. Garner and other standard force cases, you can't escalate unless the guy does something dangerous. Standing there is not doing something more dangerous. Yeah, but she agreed with you. The judge agreed with you. And said, yes, the rights, his rights were violated by the use of the dog, but the problem is it wasn't clearly established at the time. In other words, I respect that. She did say that under the plaintiff's view, we could have a finding of liability, but she said that, you know, other, sending in the dog to just subdue a person, to just take him down, even though he's not doing anything, wasn't clearly established. But I would submit that once you read Diorle, which did come out just a few weeks before this incident, you can't just send in, not against a mentally ill guy. I could say if a rational actor. How does a policeman know that a guy is mentally ill? I mean, generally. Undisputed in this record. I understand in this record. But generally, how does he know? Well, usually, I don't know generally. I guess I would observe that if he, that the officer isn't liable. If he doesn't know, he doesn't have to assume it. And unless he gets specific information to indicate it, then he maybe has a different duty of action. In this case, he obviously had an enormous amount of information to indicate that the suspect was mentally ill. But if he doesn't know, I would never hold an officer responsible for guessing as to whether a person is ill. How do you know? Because it seems that it's difficult. How do you know how a mental illness affects conduct? I mean, you can know someone's mentally ill. And, I mean, I'm constantly, you know, we're constantly faced with it. If they could tell you, well, this person, you know, is a schizophrenic or something along those lines. But how does that, you know, how can you on a, more on a split second say, well, that means that they're going to do this. Or that means that this is what their predictable behavior is. No one's asking officers to predict the behavior of mentally ill people. And I would never hold an officer to that either. But, I mean, you got to remember, this incident started hours, 10 hours, 12 hours before the officers ever arrived. Mr. Flores, you know, if you were really a dangerous mental guy, he had 10 hours to act out some real, you know, assaultive conduct. Why were the police called, though? Because Mr. Gomez, the boarder, said. He was threatening them with scissors. Well. To lock himself in the room, right? Actually, he said, look, you know what? He said in the record, I don't want to hurt this guy. And I don't want to look like I'm going to beat him up. If I take him down myself and I beat him up or I muscle him too hard, I'm going to look like I beat up an old man. I'm going to call professionals. And so it's certainly not the case. I mean, he called and said, yeah, as a matter of fact, it was even in the record that he said, I'm not going to say this guy is threatening me because I don't want police to overreact. So even the – I mean, the people there at the scene, you know, independent of police procedure, they knew that he wasn't a dangerous guy. They had taken him in three weeks before that on – without any kind of assaultive conduct. And here this particular person had done nothing other than walk around with a pair of scissors, albeit in his own house, or moreover, in his own house. Wait a minute. He did more than that. He threatened the guy. You say it's not a threat and the fellow said he didn't want to think it was a threat, but he went back into his room when he was told to, right? I would agree that – look, I think there's some concern – I'm not taking away that there's some concern that Mr. Flores could have been assaulted – could have been assaultive. I mean, he did force the guy back into his room without the scissors. All right. But when you know it's a mentally ill guy, I guess, you know, I really – maybe I've read too much into Duerley, but I really think that the law has gone in two ways that are favorable to my case. There has been more recognition and more appreciation that mentally ill subjects aren't as dangerous as they really appear to be compared to rational actors, and we have a whole, you know, kind of a string of mentally ill cases that demonstrates more sensitivity to them. And then in addition to that, we also have a series of canine cases where we're more aggressive than we really want. Well, it seems, though, that your best argument is just that they never should have sent the dog because the facts that unfold thereafter don't really support your theory that this was not a dangerous person. You know, you can't say that to the dog and you can't say that to the officer that got stabbed. And, you know, the officers, while they have a vest, I mean, you can still stab someone fatally. I think that we – you know, you can get them in the neck, you can get them in the leg. You know, there's a number of – you know, they're not – so it doesn't really – I mean, I think your best argument is that either they should have left and not done anything with him at all because he does show that he could be dangerous in the events as they unfold. I would agree that our best argument is the moment of the canine, and our Billington theory is our best argument. But nonetheless, you've got to remember that our guy – I mean, he's attacked by a dog. If I had a pair of scissors and a dog attacks me, I would stab him. I mean, I'm sorry. If a vicious dog attacks me, I'm going to stab him. The rest of the – I'm sorry? You said the dog was vicious. Well, he bites harder than most dogs. He's a 90-pound Belgian Malinois. He tore my client to shreds. So that's a characterization, I agree, but it's one I'm prepared to stand by. But with respect to the rest of the incident, that rest of the incident is disputed. I mean, you've got to remember, Jennifer Shen's testimony is at issue here. And without Jennifer Shen's testimony or without it being so very effective because we didn't – we weren't really treated fairly in challenging it, you can't say that the officer got stabbed by Flores or that – I mean, Gomez, the witness, said that Flores never left – you know, if Gomez is over there, that Flores never got further than this because he could only see them in this line of view. It's only the officers who said he stabbed me, and it's only by that controversial Shen testimony that we have these marks on the vest. Did you want to reserve your remaining time for rebuttal, or you can use it all up now if you prefer? I would like to reserve. Thank you. Thank you, Mr. Pavone. Good morning. Good morning. My name is William Donnell. I'm a deputy city attorney in the city of San Diego. I inherited this case well after it was briefed and did not participate in the trial. I do know the trial attorney, and I do know some of the facts as they occurred and the issues during the trial, but I wasn't there myself. I take it the cost issue has been conceded and is over. The court, I believe, appellant agrees with the court that he lacks – the court lacks jurisdiction to review the cost bill, so I won't deal with that issue. This is a lot of 20-20 hindsight discussion going on, I think, which is especially pertinent here. It's difficult from reading appellant's brief as to what exactly he seeks by way of relief. There was a motion – cross motion for summary judgment. Well, he wants a new trial, for one thing. Well, he didn't say he wants a new trial. He – but apparently he wants a – this Court – Well, if Jennifer – if Jennifer Shen's testimony was not properly received, he gets a new trial, doesn't he? I would agree that if you find that the trial court abused her discretion in the way that she handled Jennifer Shen, that you could award a new trial. What's the – what's the point of having a witness list, a separate witness or expert witness list, if you don't put the key expert on the list? I mean, what's – Your point earlier was well taken. I believe that in a better scenario, the attorney trying this case would have designated her as an expert in accordance with the rules. The issue I think here, as you brought up, is what's the harm. Although it may not have been handled the most efficient or eloquent way by the trial court, I think that she handled it properly. Appellant – counsel for appellant is claiming that it wasn't fair and that – that he was treated unfairly, has never been treated unfairly. He was sandbagged. He was sandbagged. He didn't think there was going to be an expert witness, and lo and behold, there's an expert witness who's the dispositive witness in the case. I believe that argument is somewhat disingenuous when you take into effect the discovery that was done in this case, and it's – it's crying after the fact. He didn't take any expert depositions. He – and in addition, this was brought up well before trial, albeit it was a week or two before trial. He didn't seek the right to take her deposition once the court informed him in his motion that he was – she was going to allow Ms. Chin to testify. Once she was allowed to testify, I think that the trial court entertained the proper Dobbert exercise as a gatekeeper and that she was qualified to testify as an expert. The question is, was he somehow harmed by the fact that she was not listed as an expert? I think that the attorney for the police and the defendants conceded that at trial and to the trial court. I would say that here we are now, I believe that she can testify, and the court maybe should have limited her testimony to her findings and not allowed her to testify as to her opinion. But in reviewing the case in her discretion as an experienced trial judge, she didn't feel that it would be reversible harm to allow her to testify as an expert. She thought that she was an expert. For plaintiff's counsel to argue – Was it the – was the lawyer for the officers just basically – it seemed to be the position that, well, she's just a lay witness. And there seemed to be that – did the lawyer just not understand what expert witnesses are? Is – so – I have out of the record information on that, but to stay within the record, I think that it was clear from the record in the testimony and the argument before the trial court that he apologized for not having designated her as an expert. And then his fallback position was, well, she's just going to testify as a recipient witness like any other gatherer of evidence and any other police officer. They're not – it's not a retained expert. And I think he – I think he should have designated her as an expert. I don't think that the harm was significant in this case. And I think that the plaintiff is not in a position – the now appellant is not in a position to argue that he was treated unfairly when he didn't seek to take her deposition, he didn't seek a continuance of trial, he didn't seek any alternate remedy to mitigate what he felt was this horrendous sandbag in trial tactics. I think that it was innocent in the way it came out. It was an oversight by the trial attorney not to designate her as an expert, him thinking that she's just – with the other police officers, she's going to testify to her findings. When could he have – when could he have asked to have had a deposition taken of her under your construct? I've tried a lot of cases, Your Honor, where the court orders depositions over the weekend in the middle of a trial. He didn't – he didn't – his – It was close to – I mean, okay, so – It was close to trial. Well, it was close to trial when this thing first came up, but that's when Judge Gonzales said, well, I'll just let her testify as a percipient witness. It wasn't until after the trial was in progress, if I remember correctly, that she reversed herself and said, okay, now she can testify as an expert. I think, as submitted, that she should have – she probably should have been – Okay, then what is he supposed to do at that point when the – Well, if – had he – had he entertained any discovery, had he interposed any interrogatories, had he sought any requests for production, had he taken a deposition, then the issue would have been flushed out. There were no depositions taken by the plaintiff here at all? The plaintiff – as my understanding, only some of the precipient officers were deposed. None of the experts were deposed. I think that it's crying over spilt milk in some degree, and I don't believe that the error was such that it deserves to be overturned. I believe that the jury – he had ample opportunity to cross-examiner the defense attorney at the time. What he didn't have, though, was an opportunity, I suppose, to find an expert who would contradict her conclusion. Yeah. And in deference to the trial attorney's decision or omitting to designate her as an expert, her testimony – a lot of her testimony was that the hole in the shirt matches up with the hole in the vest, and it's questionable whether or not that even requires expert testimony. I'm thinking of the fiber evidence. The fibers, I think, is a very minor part of this. I mean, I think the more significant aspect of her testimony was that there was, in fact, if you looked under the Velcro of the vest, that there were marks where the point of the scissors had punctured the outer material of the vest and hit the harder white covering over the Kevlar on the vest. I think that was the more impactful evidence that she testified to. The fibers were, you know, argued vehemently by plaintiff's counsel as being planted, and there was chain of custody evidence. The jury had a fair opportunity to hear all of that, and I think that the trial court properly allowed her to testify and let the jury determine the weight to give her testimony as opposed to excluding her completely. Let me ask you this. We're reviewing the summary judgment, and the fact that this case went to a jury and that there was a jury verdict, does that make any difference in how we view the summary judgment? Well, I think you have to. I mean, when I said it's difficult to understand what he's looking for, initially he wants you to overturn the determination to grant the summary judgment as to a portion of the incident for qualified immunity. And having tried these cases, it's always amazing how, although you're not allowed to use 2020. I guess what case law are you telling me out there? You know, what tells me to view the summary judgment different after a jury verdict than as on appeal than before? I don't have a case in mind for that proposition, but if you look at the facts, the summary judgment was only granted as to the use of the ASP and as to the use of the K-9. And the jury found, in a special verdict that you had before, that not only was the lethal force warranted, but that there was no negligence. They ended up, in spite of the ruling in the summary judgment that the officers were entitled to qualified immunity, plaintiffs at the time, now appellants, were able to get in all the evidence they wanted to or could from their dog training expert who testified that it was impossible. You're not helping me here. Okay. You're not really answering my question. What case law is there out there that says after you have a jury verdict that you review the summary judgment differently? I'm unaware of a case that finds that, Your Honor. So are we reviewing the summary judgment based on what was before the district court at that time? I think that that issue has been mooted by the finding of the jury that the force that was used, the less than lethal force that was used was deemed to be subject to qualified immunity. The lethal force, the court deferred as an issue of fact. We submit that that was a proper ruling. That went before the jury, and all of the events, including that less than lethal force, the use of the ASP, the use of the K-9, was before the jury with a negligence standard in the special verdict, which is a much slower threshold, I believe, than a violation of constitutional rights. And not only did they find that the lethal force was justified, they found that there was no negligence on the part of the officers in how this ended up occurring. I don't believe that Billington, this is a Billington-type situation. I don't think that the, if anything, the officers may have negligently ended up in a situation where they had to use excessive force, or not excessive force, but lethal force. So I don't believe Billington applies. And I don't believe that there, I believe that the motion that was granted is mooted by the motion that wasn't granted and the facts that came out at trial. I would submit, unless there's any questions. Roberts. Thank you very much, Mr. Demille. Thank you. Mr. Pavone, you've got about a minute and a half with the last word. Thank you, Your Honors. With respect to the Jennifer Shen, again, as you know, I was trial counsel. And I'll tell you why I did what I did, because I've made all these decisions with my best judgment. I didn't seek to take a recourse. Is that part of the record? Don't tell us anything that's not part of the record. No. But, I mean, I've been, it's a matter of debate. If he's accusing my trial decisions, I think I have a matter of right to defend it. If he's saying I didn't seek to take a continuance, which I think is undisputed, I think I'm entitled to give the explanation why I didn't do that. No, I think we can only, I think we have to admit that it is a record. I respect that. I will say, here's something that is part of the record. We were supposed to get all of Jennifer Shen's information, all the data and documents. The trial court thought it was just a two-page report. But here we are at trial, my associates frantically flipping through an inch of documents that were handed at trial. That's certainly part of the record. And that's just something that should never happen. With respect to, and I just note that, you know, these police cases, you could spend a million dollars, like any case, you could spend a million dollars on it if you wanted to. The reason why expert depots aren't always taken is because there is a lot of disclosure. Usually they give affidavits either in summary judgment or they give them pursuant to the magistrate's order. Or in this case, I didn't depose a couple of the experts because I had already deposed them before in other civil rights cases and I had a deposition. My – but my last point, going back to the dog, is I respect that the trial judge made a ruling on summary judgment and then it still went to trial. But that ruling did compromise our case at trial by taking the canine consideration out of the jury's hands. The canine was our case. If the jury had found that use of the canine was improper, then we would have been home free on Billington. And, you know, it's one thing to knock off your case, to chip away at the outside of your case, but that really was the heart of our case. And that's why I think that this case merits reconsideration on the canine issue back to summary judgment stage with, as the Court pointed out, with respect to Jennifer Thank you. Mr. Performance. Janelle, thank you. The case has started. You just submitted. Stand and recess. Good morning.
judges: Silverman, Callahan, Duffy